WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Lance Nelson Goodman,

        Plaintiff,

v.

Carolyn W. Colvin, Acting Commissioner of Social Security,

        Defendant.

No. CV-15-00807-PHX-JAT

**ORDER**

Pending before the Court is Plaintiff Lance Nelson Goodman's appeal from the Social Security Commissioner's denial of his application for disability insurance benefits under Title II of the Social Security Act. The Court now rules on Plaintiff's appeal.

I.    **Background**

    A.    **Procedural Background**

On February 9, 2012, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging that he had been unable to work since November 30, 2010. (Tr. 145).[1] Plaintiff's claims were initially denied on July 17, 2012, (Tr. 92), and upon reconsideration on January 22, 2013, (Tr. 98). Thereafter, Plaintiff timely requested a hearing, (Tr. 101), which was conducted by Administrative Law Judge ("ALJ") Joan G. Knight on June 25, 2013 in Phoenix, Arizona, (Tr. 34). On August 30, 2013, the ALJ issued a decision finding that Plaintiff suffered from ventricular

---

[1] Citations to "Tr." are to the certified administrative transcript of record. (Doc. 13).

1  tachycardia with ICD implant, status post left shoulder repair of rotator cuff tear and

2  bicep tenosynovitis, and obesity. (Tr. 17). However, the ALJ found that Plaintiff was not

3  disabled under the Social Security Act because he retained the Residual Functional

4  Capacity ("RFC") to perform jobs that exist in significant numbers in the national

5  economy. (Tr. 26). Accordingly, the ALJ rendered an unfavorable decision denying

6  Plaintiff disability insurance benefits. (Tr. 26–27).[2]

7       After Plaintiff's request for review of this decision by the Social Security

8  Administration Appeals Council was denied on March 19, 2015, (Tr. 1, 5), he

9  commenced this action in Federal Court on May 4, 2015, (Doc. 1). Plaintiff appeals the

10  final decision of the ALJ under Title 42 of the United States Code Section 405(g),

11  alleging "that the denial of his disability claim is not supported by substantial

12  evidence[.]" (*Id.* at 2). In Plaintiff's opening brief (the "Brief"), Plaintiff argues that the

13  ALJ erred by: 1) improperly finding Plaintiff's mental impairments were non-severe,

14  resulting in the omission of any mental work-related limitations from Plaintiff's RFC;

15  2) making an improper credibility finding; and 3) relying on vocational expert ("VE")

16  testimony inconsistent with the *Dictionary of Occupational Titles* ("DOT"). (Doc. 14 at

17  3). Accordingly, Plaintiff asks that the Court reverse the denial of his claim, and remand

18  for further administrative proceedings. (Doc. 1 at 2). In opposition, Defendant filed a

19  Response Brief contending that "[s]ubstantial evidence supports the ALJ's decision that

20  Plaintiff is not disabled under the Social Security Act." (Doc. 17 at 12). Accordingly,

21  Defendant asks that the Court "affirm the ALJ's decision." (*Id.*)

   **B.**   **Plaintiff's Background**

23       Plaintiff was born on December 31, 1959 and lives with his wife. (Tr. 36, 198).

---

25     [2] After examining the certified administrative transcript of record as well as the
documents e-filed by the parties in the instant appeal, the Court notes there are two
inconsequential discrepancies between the dates stated in the ALJ's decision and the
26  dates indicated in the rest of the record. Specifically, in the section of its decision entitled
'Jurisdiction and Procedural History,' the ALJ asserts that Plaintiff's claim was initially
27  denied on July 16, 2012, (Tr. 14), whereas the record indicates that this claim was
actually denied a day later on July 17, 2012, (Tr. 92). Further, the ALJ attests that
28  Plaintiff's claim was denied upon reconsideration on January 1, 2013, (Tr. 14), while the
record states that this claim was denied on reconsideration on January 22, 2013, (Tr. 98).

Although he did not graduate high school, Plaintiff does have his GED. (Tr. 36–37). Plaintiff also completed vocational school training in auto mechanics, (Tr. 37), but "has no further education or specialized job training[,]" (Tr. 222). Plaintiff previously worked in masonry since 1988, serving as a mason tender, a masonry operator, and a laborer. (Tr. 163). However, Plaintiff contends that he "can no longer do this type of work" because of his medical conditions. (Tr. 174). Accordingly, Plaintiff "has been unable to sustain gainful employment since November 30, 2010," the date on which he was laid off from his job in the construction industry. (Tr. 37, 222).

Currently, Plaintiff does not have any income, and receives public-assistance in the form of food stamps. (Doc. 2 at 1–2). On an average day, Plaintiff watches between twelve to fifteen hours of television, eats, goes for short walks, plays board games, and uses his computer. (Tr. 41, 198, 316). Plaintiff does not grocery shop or do any household chores, (Tr. 199), but does prepare meals for himself, (Tr. 280). Plaintiff can also drive, but "not long periods." (Tr. 316).[3] Alleging that his injuries and conditions affect "virtually every aspect" of his day, Plaintiff relies on his wife to assist him with most tasks and contends that he spends the majority of his time "in the house due to limited mobility and range of motion." (Tr. 196). Nevertheless, Plaintiff is able to care for his basic hygiene and bathe himself. (Tr. 41). Plaintiff states that "he has no friends," and that he tries "to refrain from seeing people." (Tr. 316). Now, he primarily only interacts with his wife. (Tr. 280).

### C.    Plaintiff's Medical Background

On June 25, 2013, Plaintiff appeared before the ALJ regarding his alleged

---

[3] There are multiple discrepancies between Plaintiff's first and second Exertional Daily Activities Questionnaires. Plaintiff's first Exertional Daily Activities Questionnaire, dated May 28, 2012, indicates he sleeps four to five hours a day, and naps two or three times daily. (Tr. 186). However, in Plaintiff's second Exertional Daily Activities Questionnaire, dated November 8, 2012, Plaintiff indicated that he is sleep deprived, does not nap, and only sleeps for three or four hours. (Tr. 199). When asked how far he can drive at one time, Plaintiff indicates in the first Exertional Daily Activities Questionnaire that he has to get out of the car if he drives "more than one hour or so." (Tr. 186). However, in response to the same question in the second questionnaire, Plaintiff states, "I can not [sic] sit for more than 20 minetes [sic] at a time." (Tr. 199).

disability of cardiac problems, shoulder condition, depression, and substance abuse. (Tr. 34–57). In regard to Plaintiff's alleged heart condition, Plaintiff was admitted for ventricular tachycardia, due to cocaine and alcohol abuse, in November of 2010. (Tr. 239–40). As a result of this condition, Plaintiff had surgery to install an implantable cardioverter defibrillator ("ICD") "for secondary prevention in the setting of prior cocaine and alcohol abuse." (Tr. 239). Plaintiff denied "any cardiac complaints" at his follow-up in December of 2010, (Tr. 240), and did not return for treatment until March 2011, at which time he was readmitted to the hospital as a result of his ICD discharging multiple times, (Tr. 246, 253). At his follow-up appointments in April and July of 2011, Plaintiff reported that he was doing much better and had no further ICD discharges. (Tr. 237–38). Although Plaintiff presented in September of 2011 with atypical chest pain, Plaintiff's ICD had not discharged. (Tr. 236). In October of 2011, Plaintiff's stress echocardiogram indicated Plaintiff had "fair exercise tolerance" for his age and concluded that there was "no 2D echocardiographic evidence of inducible ischemia to achieve[] workload." (Tr. 332).

Following these visits, Plaintiff did not return to see a cardiologist until July of 2012, where it was noted that Plaintiff had not had any further ICD discharges but did have some fatigue after eating, "likely a side effect" of his prescribed medication. (Tr. 325). From July 2012 until the date of his hearing in June 2013, Plaintiff did not return for any follow up appointments with his cardiologists. (Tr. 22). However, Plaintiff did go to the emergency room "with a complaint of a possible near syncopal episode." (Tr. 439). At this visit, Plaintiff refused admission against medical advice after his "chest x-ray revealed 'no evidence of active pulmonary disease,' an EKG revealed normal sinus rhythm and no acute ST changes were noted." (Tr. 22) (citations omitted). Plaintiff stated at his hearing that he has unpredictable attacks every day, (Tr. 42), where he starts to feel dizzy and feels blood running through his chest until the defibrillator "settles it down[,]" (Tr. 47).[4]

---

[4] One reviewing physician has attributed these symptoms as possible side effects

In regard to his shoulder condition, Plaintiff had elective arthroscopic surgery to repair his left rotator cuff in November of 2011. (Tr. 243). At his follow up appointment in March 2012, Plaintiff reported his symptoms were better, rated his pain with "heavy activity" as only 1/10, and assessed his satisfaction with the surgery at 8/10. (Tr. 458). At this time, the reviewing physician noted Plaintiff's shoulder was "getting better," and that other than "occasional pain with heavy activity," Plaintiff "is very happy." (Tr. 458). Following this appointment, Plaintiff did not return for any subsequent treatment until May 2013, shortly before his hearing before the ALJ. (Tr. 457). At this visit, Plaintiff indicated that he "fe[lt] like his symptoms ha[d] worsened recently," (Tr. 457), with pain aggravated by lifting and reaching motions, (Tr. 454). However, a reviewing physician noted that Plaintiff's postoperative rotator cuff tear "appears stable." (Tr. 309). Plaintiff specified at the ALJ proceedings that he now has "arthritis in [his] shoulders and [his] neck," and needs back surgery as a result of chronic back pain. (Tr. 43, 307). Plaintiff was prescribed Percocet for the joint pain in his shoulder region. (Tr. 368).

Plaintiff also alleges to suffer additional impairment as a result of depression and anxiety, but has "never sought mental health treatment" at any out-patient or in-patient psychiatric facility. (Tr. 316). In the past, Plaintiff's primary care provider and cardiologists consistently noted that Plaintiff had a "normal mood and affect." (Tr. 18). Although Plaintiff contends he began to have difficulty with depression over the course of the past few years, (Tr. 315), the ALJ indicated that he was "never diagnosed until his primary care provider noted that he presented with disability paperwork," (Tr. 18). Plaintiff attributes his depression to his medical issues, specifically because he has been unable to work, has gained weight as a result of his inability to do physical activities, and because his health continues to decline. (Tr. 281). Plaintiff states he is moody and that he has "just phased [himself] out of everything over the years." (Tr. 315). While Plaintiff has contemplated suicide in the past, he has "not recently," nor has he ever attempted to

due to medication. (Tr. 309). Plaintiff himself has acknowledged that, "[t]he blood pressure medicine may be why I'm blacking out." (Tr. 315).

take his life. (Tr. 315). Plaintiff's primary care provider prescribed buspirone for Plaintiff's nerves and anxiety. (Tr. 372).

While Plaintiff's medical record illustrates that he has a history of alcohol abuse, Plaintiff stated at the ALJ proceedings on June 25, 2013 that he only occasionally drinks alcohol, "not even once a month," due to his high blood pressure. (Tr. 45). However, when Plaintiff's risk factors were reviewed at an appointment in May of 2013, Plaintiff confirmed that he drinks "six cans of beer" per week. (Tr. 455). Plaintiff also has a history of cocaine, marijuana and methamphetamine use, but contends that "his addiction is in the past." (Tr. 226).[5] In regard to his cocaine use, Plaintiff stated at the hearing before the ALJ that he has been "clean and sober for two and a half years." (Tr. 44). Regarding the ALJ's question of whether drugs and alcohol were part of Plaintiff's lifestyle today, Plaintiff responded, "You couldn't pay me to do either one right now." (Tr. 44). However, Plaintiff's medical record demonstrates that he was drinking alcohol and smoking marijuana prior to being admitted to the hospital in March of 2011. (Tr. 62). Further, Plaintiff's testimony at the proceedings before the ALJ is inconsistent with his medical record, as illustrated by the following exchange between the ALJ and Plaintiff:

> Q:   Since November 2010, have you used any other drugs not prescribed by your doctors?
>
> A:   No ma'am, high blood pressure medicine and painkillers.
>
> Q:   The records indicate, though, in March 2011, you . . . tested positive for alcohol and marijuana. Any use of marijuana since November 2010?
>
> A:   No.

(Tr. 46).

In addition to the medical conditions listed above, Plaintiff has chronic tinnitus

---

[5] In addition to an incarceration for a DUI at age 19, (Tr. 281), Plaintiff was once arrested "when [he] was caught with 800 pounds of marijuana in Arkansas[,]" (*id.*) As a result, Plaintiff spent time in prison in Arkansas. (*Id.*) Plaintiff was also "caught with raw cocaine," for which he spent time in the Maricopa County prison facility. (Tr. 316). Plaintiff is not currently "under any legal sanctions" or on probation for any drug related crimes. (Tr. 157, 281).

1    associated with hearing loss. (Tr. 309). However, this condition "has not been alleged to

2    cause any significant impairment of his ability to conduct work activity," (Tr. 22), and,

3    on physical examination, Plaintiff's ears were found to be "normal," (Tr. 232). Plaintiff

4    has also been diagnosed as morbidly obese. (Tr. 309).

5    ## II.    Legal Standard

6         The ALJ's decision to deny benefits will be overturned "only if it is not supported

7    by substantial evidence or is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747,

8    750 (9th Cir. 1989) (quotation omitted). "Substantial evidence" means more than a mere

9    scintilla, but less than a preponderance; it is such "relevant evidence which a reasonable

10   person might accept as adequate to support a conclusion." *Reddick v. Chater*, 157 F.3d

11   715, 720 (9th Cir. 1998).

12        In determining whether there is substantial evidence to support a decision, the

13   Court considers the record as a whole, weighing both the evidence that supports the

14   ALJ's conclusions and the evidence that detracts from the ALJ's conclusions. *Reddick*,

15   157 F.3d at 720; *see also Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) ("The

16   inquiry here is whether the record, read as a whole, yields such evidence as would allow a

17   reasonable mind to accept the conclusions reached by the ALJ." (citation omitted)).

18   "Where evidence is susceptible of more than one rational interpretation, it is the ALJ's

19   conclusion which must be upheld; and in reaching his findings, the ALJ is entitled to

20   draw inferences logically flowing from the evidence." *Gallant*, 753 F.2d at 1453

21   (citations omitted); *see Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th

22   Cir. 2004). This is because "[t]he trier of fact and not the reviewing court must resolve

23   conflicts in the evidence, and if the evidence can support either outcome, the court may

24   not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019

25   (9th Cir. 1992); *see Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990).

26        The ALJ is responsible for resolving conflicts in medical testimony, determining

27   credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

28   Cir. 1995). Thus, if on the whole record before the Court, substantial evidence supports

the Commissioner's decision, the Court must affirm it. *See Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); *see also* 42 U.S.C. § 405(g). On the other hand, the Court "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quotation omitted).

Notably, the Court is not charged with reviewing the evidence and making its own judgment as to whether Plaintiff is or is not disabled. Rather, the Court's inquiry is constrained to the reasons asserted by the ALJ and the evidence relied upon in support of those reasons. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

## A. Definition of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show that, among other things, he is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person is:

> under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. § 423(d)(2)(A).

Disability has "a severity and durational requirement for recognition under the [Social Security] Act that accords with the remedial purpose of the Act." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1459 (9th Cir. 1995). "A claimant bears the burden of proving that an impairment is disabling." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (quoting *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985)). "The mere existence of an impairment is insufficient proof of a disability." *Matthews*, 10 F.3d at 680 (citing *Sample v. Schweiker*, 694 F.2d 639, 642–43 (9th Cir. 1982)). Rather, "[t]he applicant must show that he is precluded from engaging in not only his 'previous work,' but also from performing 'any other kind of substantial gainful work' due to such

impairment." *Id.* (quoting 42 U.S.C. § 423(d)(2)(A)).

**B.     Five-Step Evaluation Process**

The Social Security regulations set forth a five-step sequential process for evaluating disability claims. 20 C.F.R. § 404.1520(a)(4); *see also Reddick*, 157 F.3d at 721. A finding of "not disabled" at any step in the sequential process will end the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at the final step. *Reddick*, 157 F.3d at 721. The five steps are as follows:

First, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled.

Second, if the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). To be considered severe, the impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities are the "abilities and aptitudes to do most jobs," such as lifting, carrying, reaching, understanding, carrying out and remembering simple instructions, responding appropriately to co-workers, and dealing with changes in routine. 20 C.F.R. § 404.1521(b). Further, the impairment must either have lasted for "a continuous period of at least twelve months," be expected to last for such a period, or be expected "to result in death." 20 C.F.R. § 404.1509 (incorporated by reference in 20 C.F.R. § 404.1520(a)(4)(ii)). The "step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). If the claimant does not have a severe impairment, then the claimant is not disabled. 20 C.F.R. § 404.1520(c).

Third, having found a severe impairment, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is found disabled without further inquiry into the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d). If not, before

proceeding to the next step, the ALJ will make a finding regarding the claimant's RFC "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). A claimant's RFC is the most he can still do despite the effects of all the claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a)(1).

At step four, the ALJ determines whether, despite the impairments, the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). To make this determination, the ALJ compares its "residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1520(f). If the claimant can still perform the kind of work he previously did, the claimant is not disabled. 20 C.F.R. § 1520(a)(iv). Otherwise, the ALJ proceeds to the final step.

At the final, fifth step, the ALJ determines whether the claimant "can make an adjustment to other work" that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the ALJ considers the claimant's RFC and his "age, education, and work experience." 20 C.F.R. § 404.1520(g)(1). If the claimant can perform other work, he is not disabled. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he will be found disabled.

In evaluating the claimant's disability under this five-step process, the ALJ must consider all evidence in the case record. *See* 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1520b. This includes medical opinions, records, self-reported symptoms, and third-party reporting. *See* 20 C.F.R. § 404.1527; 20 C.F.R. § 404.1529; SSR 06–3p, 71 Fed. Reg. 45593-03.

### C. The ALJ's Evaluation under the Five-Step Process

In step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of November 30, 2010. (Tr. 16). At step two, the ALJ concluded that Plaintiff had the following severe medically determinable impairments: "ventricular tachycardia with ICD implant; status

post left shoulder repair of rotator cuff tear and bicep tenosynovitis; and obesity." (Tr. 17). The ALJ deemed these impairments "severe" because they had caused and would continue to cause "more than minimal work-related functional limitations." (*Id.*) At step three, the ALJ determined that Plaintiff's impairments, singly and in combination, did not meet or medically equal the severity of the impairments listed in the Social Security regulations. (Tr. 19).

Before moving on to step four, the ALJ conducted an RFC determination after careful consideration of the entire record, including Plaintiff's testimony and the objective medical evidence. (Tr. 20). The ALJ found that Plaintiff "has the residual functional capacity to perform light work." (*Id.*) Consequently, the ALJ stated that:

> [T]he claimant is able to occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and is unlimited in his ability to push or pull other than for weight limits suggested. He can sit, or stand/walk each activity for about 6 out of 8 hours, with normal breaks. The claimant is also able to occasionally crawl, but should never be required to climb ladders, ropes, or scaffolds, and can frequently climb ramps, stairs, stoop, kneel and crouch. He can occasionally reach overhead with the nondominant left upper extremity. He must avoid concentrated exposure to hazards including moving machinery and unprotected heights.

(*Id.*)

At step four, the ALJ found that Plaintiff could not perform "any past relevant work." (Tr. 25). Finally, the ALJ concluded at step five that based on Plaintiff's RFC, age, education, and work experience, Plaintiff could perform significant numbers of jobs existing in the national economy including fast food worker, cashier, and car wash attendant. (Tr. 25–26). Consequently, the ALJ found that Plaintiff was not disabled under the Social Security Act. (Tr. 26).

## III. Analysis

Plaintiff makes three main arguments for why the Court should set aside the ALJ's decision. Specifically, Plaintiff asserts that the ALJ committed the following errors: 1) improperly finding Plaintiff's mental impairments were non-severe at step two, resulting in the inappropriate omission of any mental work-related limitations from

Plaintiff's RFC; 2) making an improper credibility finding by failing to consider Plaintiff's "stellar" work record; and 3) relying on VE testimony inconsistent with the DOT without explaining the inconsistency. (Doc. 14 at 3). After considering the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision. Accordingly, the Court affirms.

### A. Whether Substantial Evidence Supports the ALJ's Finding that Plaintiff's Mental Impairments are Not Severe

Plaintiff contends the ALJ erred at step two of the sequential evaluation process by classifying his mental impairments as not severe. (Doc. 14 at 10–11). Consequently, Plaintiff claims the ALJ improperly omitted Plaintiff's mental functional limitations from the RFC. (*Id.* at 4–11). In support of his argument, Plaintiff argues that "[t]he opinions of both consultative psychological examiners," Dr. Lavit and Dr. Geary, establish that Plaintiff has mental work-related limitations." (*Id.* at 4). Plaintiff further alleges that Dr. Lavit and Dr. Geary's opinions are consistent with the underlying medical record, including their own examination findings. (*Id.* at 6). Moreover, Plaintiff insists that "the ALJ's rationales for determining that [Plaintiff's] mental impairments are non-severe and result in no mental limitations on his ability to work are legally deficient and/or factually inaccurate." (*Id.* at 8). As a result, Plaintiff contends that the ALJ's mental nonseverity finding lacks the support of substantial evidence. (*Id.*)

At step two of the sequential evaluation, the ALJ "determines whether the claimant has a medically severe impairment or combination of impairments." *Smolen*, 80 F.3d at 1289–90. "An impairment or combination of impairments can be found nonsevere only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Frias v. Colvin*, No. CV-15-02185-JEM, 2015 WL 8492453, at *7 (C.D. Cal. Dec. 10, 2015) (citing *Smolen*, 80 F.3d at 1290). Accordingly, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citation omitted). "Thus, applying our normal standard of review to the requirements of step two, we must

determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments.'" *Id.*

When the severity of a mental impairment is evaluated at step two, the ALJ must first determine whether the claimant has a "medically determinable mental impairment[]." 20 C.F.R. § 404.1520a(b)(1). Should the ALJ decide that a claimant has such a medically determinable mental impairment, the ALJ "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment[]" in her written decision. 20 C.F.R. §§ 404.1520a(b)(1), (e)(4). Next, the ALJ must rate "the degree of functional limitation resulting from the impairment[]" in four broad functional areas: (i) activities of daily living; (ii) social functioning; (iii) concentration, persistence, or pace; and (iv) episodes of decompensation. 20 C.F.R. §§ 404.1520a(b)(2), (c)(3).[6] The degree of functional limitation is based on the extent to which the claimant's impairment interferes with his ability "to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). Finally, after the degree of functional limitation is rated, the ALJ determines the severity of the claimant's mental impairment. 20 C.F.R. § 404.1520a(d). If the degree of limitation in the first three functional areas is "none" or "mild" and "none" in the fourth area, it is generally concluded that the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Here, the ALJ comprehensively illustrated why she found Plaintiff's mental impairment to be non-severe at step two of the evaluation after careful consideration of the entire record of medical evidence and the claimant's testimony. (Tr. 17–19, 24–25). First, the ALJ determined that Plaintiff had medically determinable mental impairments,

---

[6] When rating the categories of daily living, social functioning, and concentration, persistence, or pace, the ALJ is to use a five point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). When rating episodes of decompensation, the ALJ is to use a four-point scale of none, one or two, three, or four or more. *Id.*

including dysthymic disorder and history of cocaine and alcohol abuse. (Tr. 17). Rating the degree of functional limitation, the ALJ found that Plaintiff's "medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area." (Tr. 19). As a result, the ALJ concluded that these mental impairments, "considered singly or in combination with the claimant's other severe and nonsevere conditions, do not cause anything more than minor restriction in their ability to complete work-related activities" and, therefore, are non-severe. (*Id.*) The ALJ's conclusion is supported by the record.

Plaintiff is correct that the opinions of Dr. Lavit and Dr. Geary indicate that Plaintiff has some mental work-related limitations.[7] However, these opinions do not, as

---

[7] Dr. Lavit diagnosed Plaintiff with cocaine dependence, though in remission, alcohol abuse, and dysthymic disorder associated with a medical condition. (Tr. 284). Regarding Plaintiff's understanding and memory, Dr. Lavit noted that Plaintiff's "ability to understand and remember . . . instructions is not impaired." (Tr. 285). Dr. Lavit neither had to repeat or explain questions, and Plaintiff was able to recall dates and events. (*Id.*) Accordingly, because Plaintiff "evidenced a positive memory and understanding," Dr. Lavit found Plaintiff had "no limitations in remembering work like procedures." (*Id.*) In regard to Plaintiff's ability to sustain concentration and persistence, Dr. Lavit indicated that Plaintiff "remained focus through the meeting," but noted that his ability to concentrate for extended periods of time and maintain a normal routine without special supervision "may be limited due to anxiety and depression." (*Id.*) Dr. Lavit also mentioned that Plaintiff's "ability to get along with co-workers, respond appropriately to supervision and maintain socially appropriate behavior may be impaired due to health factors and being reactive when he is angry." (*Id.*) Regarding his capacity to adapt to change, Plaintiff may be limited "in his ability to respond appropriately to heightened stresses/changes in the workplace[,]" but "appears to have no limitation in taking appropriate action if he encounters a normal hazard." (Tr. 284). While Dr. Lavit found that Plaintiff had mental work-related limitations, he did raise "concern as to Plaintiff's veracity and possible exaggeration of symptoms[,]" as Plaintiff "was not consistent with records reviewed versus his data reported" to Dr. Lavit. (*Id.*)

Dr. Geary, the second consultative psychologist, diagnosed Plaintiff with dysthymic disorder of late onset, mild to moderate and untreated, a history of alcohol abuse in partial reported remission, and polysubstance dependence in one year reported remission. (Tr. 316). Similar to Dr. Lavit, Dr. Geary also found that Plaintiff had no limitations in his ability to understand and remember instructions and work-like procedures. (Tr. 318). Regarding Plaintiff's ability to carry out instructions, maintain concentration and sustain regular attendance, Dr. Geary noted that Plaintiff's "pace seems somewhat slowed but he can carry out directives." (Tr. 318). Unlike Dr. Lavit, Dr. Geary found that Plaintiff had no limitations in regard to social interaction. As far as his ability to adapt to change, Dr. Geary indicated that Plaintiff "would need some time to adjust to workplace changes but he would eventually do so." (Tr. 319).

Plaintiff suggests, (Doc. 14 at 6), conclusively establish that Plaintiff's mental impairments are severe, nor clearly establish that there is more than a minimal limitation in Plaintiff's ability to do basic work activities. Rather, the ALJ provided clear and convincing reasons, supported by the evidence, indicating the opposite. (Tr. 17–19, 24–25). Accordingly, "[w]here evidence is susceptible to more than one rational interpretation," as Dr. Geary and Dr. Lavit's reports are here, "it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citing *Andrews*, 50 F.3d at 1039–40.

The ALJ provided sound, specific reasons for finding that Plaintiff's mental impairments are non-severe. (Tr. 17–19, 24–25). The ALJ noted that Plaintiff "clearly has made an effort to avoid others based on a self-described issue" and has "some cognitive deficits caused by his prior drug use expanding for the previous 25 years." (Tr. 18). Nonetheless, the ALJ emphasized that Plaintiff's "near constant unremarkable presentation with both his primary care provider and cardiologists, as well as no specific treatment from any mental health provider[,] and the suggestion of exaggerating hi[s] symptoms by Dr. Lavit are not convincing evidence of a severe mental health condition." (Tr. 19). These specific, legitimate reasons laid out in the ALJ's decision indicate that the medical evidence clearly established that Plaintiff did not have a severe mental limitation. *See Frias*, 2015 WL 8492453, at *7 (affirming the ALJ's finding that claimant's mental health impairments are only mild in severity, despite claimant's contention that the moderate limitations assessed by the psychological examiner and two Agency reviewers "cannot be viewed as nonsevere," because ALJ provided "specific, legitimate reasons for rejecting such limitations"). Accordingly, substantial evidence supports the ALJ's finding at step two that Plaintiff's mental limitations are non-severe. Where the ALJ's interpretation of the record evidence is reasonable, as it is here, it should not be second guessed. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

Plaintiff maintains "[i]t was clear error for the ALJ to assign 'great weight'" to the opinions offered by Dr. Geary and Dr. Levit, but then omit the mental limitations they

offered from the RFC finding. (Doc. 14 at 8). Nevertheless, this argument fails, as it is based on Plaintiff's gross mischaracterization of Dr. Geary and Dr. Levit's opinions as supporting "additional functional limitations beyond those that the ALJ included in the RFC." (Doc. 17 at 6). When determining Plaintiff's RFC, the ALJ summarized Dr. Lavit and Dr. Geary's opinions as follows:

> In both assessments, [Dr. Lavit][8] and Dr. Geary opined that the claimant satisfied the diagnostic criteria for a dysthymic disorder, with a secondary diagnosis of polysubstance and alcohol abuse. . . . Tellingly, the claimant reported largely the same level of activity, but also that he was pursuing disability due to his physical impairments, had not engaged in any mental health treatment, and his choice to avoid others was based on a self-imposed restriction due to alleged mood swings. . . . Yet, despite the claimant's allegations, based in part on his suggested exaggeration with [Dr. Lavit], the claimant was indicated to only be mildly impaired but nonetheless able to understand and remember simpl[e] and complex instructions without impairment.

(Tr. 24–25).

The ALJ's inclusion of this statement summarizing Dr. Lavit and Dr. Geary's proffered mental limitations indicates that the ALJ considered "all of the [mental] limitations imposed by the claimant's [mental] impairments, even those that are not severe[,]" when determining Plaintiff's RFC. *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (citation omitted); *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (finding that an RFC assessment "adequately captures" a claimant's limitations in concentration, persistence, and pace as long as the assessment is "consistent with restrictions identified in the medical testimony"). Ultimately, the ALJ's assessment was consistent with the medical evidence and testimony.

Moreover, even if the ALJ should have found Plaintiff's mental impairment to be severe, this error is harmless as "it is inconsequential to the ultimate nondisability

---

[8] The ALJ's RFC assessment incorrectly referred to Dr. Briggs as one of the consultative psychologists, rather than Dr. Lavit. As the Exhibits the ALJ cites in this section refer to Dr. Lavit's consultative reviewing opinion—rather than that of Dr. Briggs—the Court surmises this was a mere oversight.

determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012); *see also Gray v. Comm'r of Soc. Sec. Admin.*, 365 F. App'x 60, 61 (9th Cir. 2010) (rejecting argument that the ALJ erred at step two by determining certain impairments were nonsevere, because any alleged error was harmless since "the ALJ concluded that [claimant's] other medical problems were severe impairments"); *Feild v. Colvin*, No. CV-12-00330-TUC-BPV, 2013 WL 4525198, at *8 (D. Ariz. Aug. 27, 2013) ("Error in a step two determination that some impairments are nonsevere is harmless when the ALJ determines that other impairments are severe and proceeds through the sequential evaluation considering the allegations of functional limitations imposed by non-severe impairments."). Despite finding that Plaintiff's medically determinable mental conditions were non-severe, the ALJ found that Plaintiff had severe physical impairments at step two, and continued with the sequential evaluation. (Tr. 17). Then, at step five, (Tr. 26), the ALJ found that Plaintiff could perform three unskilled occupations—jobs that require "little or no judgment to do simple duties that can be learned on the job in a short period of time," 20 C.F.R. § 404-1568(a). Plaintiff has failed to provide any evidence indicating that he is incapable of utilizing "little or no judgment," and therefore unable to perform the mental demands of these unskilled occupations. On the contrary, the record evidence, including Dr. Lavit and Dr. Geary's reports, indicates Plaintiff has the capacity to do so. *See* (Tr. 285, 318). Accordingly, substantial evidence supports the ALJ's finding at step two that Plaintiff's mental impairments were non-severe.

**B.    Whether the ALJ Properly Assessed the Credibility of Plaintiff's Subjective Complaints**

Next, Plaintiff challenges the ALJ's credibility finding. (Doc. 14 at 11–12). While Plaintiff contends that the ALJ failed to adequately consider his "stellar" work record when making credibility findings, (Doc. 14 at 11–12), his argument has no merit. Nowhere in the ALJ's decision does she mention that she explicitly did not consider Plaintiff's work record when making her credibility findings. (Tr. 14–27). In fact, the ALJ specifically states that she considered the "entire record," which would include any evidence of Plaintiff's "stellar" work record, in making her determination. (Tr. 20).

Furthermore, there is no requirement that the ALJ automatically enhance Plaintiff's credibility or credit all of his subjective complaints merely because he maintained work in the past; the Court has found no case law requiring an ALJ to do so, nor did Plaintiff provide any to this end.

"In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009). "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, as a threshold matter, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)); *see also Smolen*, 80 F.3d at 1282 ("By requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom, the . . . test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon."). Second, if the claimant meets the first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

When weighing a claimant's credibility, "the ALJ may consider 'ordinary techniques of credibility evaluation[.]'" *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217,

1224 n.3 (quoting *Smolen*, 80 F.3d at 1284). For example, the ALJ may consider inconsistencies in either the claimant's testimony or between the testimony and the claimant's conduct, *id.*; "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment,'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1284); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter*, 504 F.3d at 1040.

### 1.    Plaintiff's Limited Treatment History and Near Constant Unremarkable Presentation

In her explanation for why she found Plaintiff's mental impairments non-severe at step two, the ALJ first noted that Plaintiff "has never engaged in any regular outpatient mental health treatment, or required any in-patient psychiatric care." (Tr. 18). Rather, the ALJ pointed out that Plaintiff's presentation to his physicians has largely been unremarkable:

> [I]n treatment with his cardiologists, the claimant has maintained a 'normal affect' through January of 2013 . . . , and with his primary care provider, the claimant has always been noted as demonstrating good judgment and insight, [and] normal mood and affect, . . . with his recent and remote memory normal and intact. . . . In fact, the claimant was never diagnosed with a depressive or anxiety disorder until his primary care provider noted that he presented with disability paperwork[.] . . .Yet, even there, the claimant maintained his unremarkable presentation, . . . and in the next three appointments with [his primary care provider], these mental diagnoses were not provided.

(*Id.*)

Plaintiff, however, challenges the ALJ's finding on this point. Plaintiff states he "specifically informed Dr. Lavit that he was unable to seek treatment for his symptoms due to his 'limited insurance.'" (Doc. 14 at 9). Quoting *Gamble v. Chater*, Plaintiff contends that "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." 68 F.3d 319, 321 (9th Cir. 1995).

"The fact that Plaintiff has had limited mental health treatment is not a sufficient sole reason to find that [his] mental impairments are not severe at Step Two." *Cook v.*

*Colvin*, No. CV-15-08158-PCT-ESW, 2016 WL 3961710, at *5 (D. Ariz. July 22, 2016); *see also Balladarez v. Colvin*, No. CV-13-9490-MAN, 2014 WL 7185342, at *6 (C.D. Cal. Dec. 16, 2014) ("[T]he methods by which plaintiff treated, or failed to treat, his alleged mental impairments are not relevant to a determination of whether plaintiff has a 'medically determinable' mental impairment."). Nevertheless, the ALJ did not make its finding that Plaintiff's mental impairments were not severe solely based on Plaintiff's limited mental health treatment for those conditions, nor did the ALJ expressly place any weight on this factor in discounting Plaintiff's credibility.

Furthermore, while Plaintiff alleges that he did not seek medical care for his mental impairments due to his "limited insurance," (Tr. 281), Plaintiff received other medical care from his cardiologists and from his primary care physician on many occasions from his alleged disability date onward, (Tr. 18–25); Plaintiff even had an elective surgery to repair a torn rotator cuff on his left shoulder, (Tr. 243). Accordingly, the Court holds that this was a specific, sound reason supporting the ALJ's finding that Plaintiff's mental impairments are non-severe, as Plaintiff clearly had the means, and the insurance, to pay for mental health treatment. *See Flaten*, 44 F.3d at 1464 (upholding an adverse credibility determination for failure to seek treatment despite claimant's alleged inability to pay because claimant received other medical care during the time she professed she was unable to afford treatment); *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (finding it appropriate to consider "an unexplained, or inadequately explained, failure to seek treatment" when engaging in credibility determinations). The Court therefore rejects Plaintiff's claim that the ALJ erred in relying on Plaintiff's failure to seek treatment for his mental impairments.

### 2.   Plaintiff's Report During the Consultative Examinations Regarding His Inability to Work

According to the ALJ, Plaintiff's lack of severe mental impairment is also supported by the fact that Plaintiff admitted he did not experience mental health issues that prevented him from working. (Tr. 18). Specifically, Plaintiff's report to Dr. Lavit during the consultative psychological examination indicated that "he cannot work in his

profession (construction) because of the *physical* work." (Tr. 279) (emphasis added).

Although Plaintiff clearly indicated that he can no longer work in construction due to its physical requirements, Plaintiff contends that he also cited a mental condition barring his ability to work in his report to Dr. Lavit. (Doc. 14 at 9). In this report, Plaintiff states that he cannot work "due to having heart problems, feeling dizzy, chest pain[,] . . . heart arrhythmia[,]" and because "[h]e feels he is going to die." (Tr. 279). According to Plaintiff, his statement to Dr. Lavit about his "fears of dying clearly suggest[s] underlying anxiety[,]" a nonphysical condition which precludes him from working. (Doc. 14 at 9). However, the Court agrees with Defendant that "Plaintiff plainly linked his alleged fear to his physical condition, instead of a mental impairment." (Doc. 17 at 5). It is obvious from Dr. Lavit's written report that Plaintiff was describing the physical conditions he feels when he exerts himself, rather than his mental health. (Tr. 279). Plaintiff's statement clearly undermines his contention that his mental impairments are severe, as these impairments, by his own admission by omission to Dr. Lavit, did not previously interfere with his ability to do basic work activities, while his physical afflictions had. Consequently, the Court holds that this was a specific, sound reason to support the ALJ's finding that Plaintiff's mental impairments are non-severe. *Gallant*, 753 F.2d at 1453 ("Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld[.]" (citations omitted)).

### 3.   Plaintiff's Daily Activities and Possible Exaggeration of Symptoms

Finally, the ALJ noted that Dr. Lavit's suggestion that Plaintiff was possibly exaggerating his symptoms supported her finding that Plaintiff lacks a severe mental impairment. (Tr. 18). Specifically, Dr. Lavit observed in his psychological report that Plaintiff's statements, including his daily activities, were inconsistent with his treatment records, "raising concern as to his veracity and possible exaggeration of symptoms." (Tr. 284).

Although Plaintiff asserts that Dr. Lavit's conclusion was unfounded because he "only reviewed cardiology records, and was not provided with a copy of Plaintiff's

1    primary care physicians records[,]" (Doc. 14 at 9), Plaintiff's argument fails. Had Dr.

2    Lavit reviewed the rest of the medical records—including those from Plaintiff's primary

3    care physician—he would have noted only meager evidence of mental health symptoms.

4    In fact, throughout the record, Plaintiff's doctors consistently observed that Plaintiff

5    lacked mental health issues, *see, e.g.*, (Tr. 237–39, 287, 290–92, 325, 328–30, 351, 357,

6    364, 368, 371, 374, 378, 382, 385, 389, 392, 395, 400, 404, 408, 413, 415, 417–418), and

7    Plaintiff obtained a near perfect score on his mini-mental status exam, (Tr. 280, 314).

8    Moreover, as the ALJ explained, Plaintiff "was never diagnosed with a depressive or

9    anxiety disorder until his primary care provider noted that he presented with disability

10   paperwork[.]" (Tr. 18). Even then, his primary care provider indicated that Plaintiff

11   exhibited "normal mood and affect." (Tr. 371). Overall, Plaintiff's medical records would

12   have only "confirmed Dr. Lavit's skepticism about Plaintiff's allegations regarding his

13   mental health symptoms." (Doc. 17 at 4). Moreover, as "[c]ontradiction with the medical

14   record is a sufficient basis for rejecting [a] claimant's subjective testimony," the ALJ did

15   not err in noting Plaintiff's inconsistent testimony here. *Carmickle*, 533 F.3d at 1161 *see*

16   *also Bickell v. Astrue*, 343 F. App'x 275, 277 (9th Cir. 2009) ("Inconsistencies and a

17   tendency to exaggerate provide a valid basis for discrediting the testimony of a claimant."

18   (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001))).

19            **4.       Conclusion**

20            Based on the foregoing, the ALJ's negative credibility finding was a reasonable

21   interpretation of the evidence. The ALJ made specific findings supported by the record

22   that provided clear and convincing reasons to explain her credibility evaluation.[9]

23   Consequently, "it is not [the Court's] role to second-guess it." *Rollins*, 261 F.3d at 857

---

24
25            [9] The ALJ cited additional reasons for finding Plaintiff's subjective complaints not
     entirely credible. First, the ALJ noted that Plaintiff stopped working not because of his
26   impairments, but because he had been laid off. (Tr. 21). As, "the physical or mental
     impairment(s) must be the primary reason for the individual's inability to engage in
27   substantial gainful activity," the ALJ found this fact significant in the determination,
     especially "[w]hen taken in consideration with the claimant's activity of applying for jobs
28   while receiving unemployment benefit[s]." (Tr. 20–21). Second, the ALJ indicated that
     Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his]
     symptoms are not entirely consistent." (Tr. 20).

(citing *Fair*, 885 F.2d at 604).

### C.   Whether the ALJ Properly Relied on the Vocational Expert's Testimony Regarding the DOT

The Court next turns to Plaintiff's argument that the ALJ erred at step five of the sequential evaluation by failing to resolve an alleged conflict between the VE's testimony and the DOT. (Doc. 14 at 13–15). Specifically, Plaintiff claims that, according to the descriptions in the DOT, the jobs identified by the VE are incompatible with Plaintiff's RFC, which limits him to occasional overhead reaching with his left arm. (*Id.* at 14–15). Plaintiff bases this contention on his review of the DOT supplement, the *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles* ("SCO"). (*Id.* at 13–15). According to Plaintiff, the SCO indicates that "the job of fast food worker requires *constant* reaching while the remaining jobs [identified by the VE, cashier and car wash attendant,] require *frequent* reaching." (*Id.* at 14–15) (citations omitted). Accordingly, because "the jobs offered by the vocational expert ostensibly require frequent (or even constant) overhead reaching," (*id.* at 15), while "[t]he ALJ's RFC and hypothetical question to the vocational expert limited [him] to . . . only occasional overhead reaching" with his left arm, (*id.* at 14), Plaintiff alleges that the VE's testimony conflicts with the DOT, (*id.* at 15). As a result, Plaintiff contends that the ALJ erred by relying on the VE's testimony without resolving this purported inconsistency, and, consequently, did not meet its "burden of proof . . . at step 5 to establish that there is other work . . . [Plaintiff] can perform[.]" (*Id.* at 13).

Defendant, on the other hand, argues that "substantial evidence supports the ALJ's finding that the vocational expert's . . . testimony was consistent with the *Dictionary of Occupational Titles* (DOT)." (Doc. 17 at 2). First, Defendant contends that "Plaintiff did not raise this issue during the administrative hearing and, as a result, has not preserved it on appeal." (*Id.* at 10). Defendant reports that even though "the VE informed the ALJ that her testimony—in which she confirmed that a person with Plaintiff's left upper extremity limitation could perform the jobs she identified—did not conflict with the DOT" at the administrative hearing, Plaintiff's counsel declined the "opportunity to question the VE

. . . on this point[.]" *Id.* (citing Tr. 54–55).

Defendant also contends, "even if Plaintiff had preserved this point, his argument fails on the merits because there is no apparent conflict between the VE's testimony and the DOT." (*Id.*) Defendant argues that an ALJ is only required to "obtain 'a reasonable explanation [from the VE] for the apparent conflict' between the VE's testimony and the DOT" if the "VE's testimony 'appears to conflict with the DOT.'" (*Id.*) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). In support of its position that "[n]o such conflict existed here[,]" (*id.* at 11), Defendant cites *Matthewson v. Colvin*, No. CV-14-08204-PCT-GMS, 2015 WL 9297648, at *3–6 (D. Ariz. Dec. 22, 2015), which, according to Defendant, holds that "a limitation to occasional overhead reaching with one upper extremity does not conflict with DOT occupations requiring frequent reaching," (Doc. 17 at 11). "Thus, given the lack of conflict," Defendant argues "the ALJ was not required to obtain any further explanation from the VE about the occupations she identified." (*Id.*)

"At step five of the sequential evaluation for disability, the Commissioner bears the burden of proving that the SSI claimant can perform other work in the national economy, given the claimant's RFC, age, education, and work experience." *Gonzales v. Colvin*, No. 12-CV-01068-AA, 2013 WL 3199656, at *3 (D. Or. June 19, 2013) (citations omitted). When determining whether a claimant can perform other work, "the best source for how a job is generally performed" in the national economy is usually the DOT. *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (citations omitted). However, "[t]he DOT is not the sole source of admissible information concerning jobs." *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995) (quotation omitted). Rather, the ALJ may also rely on testimony from a VE, even if the VE's testimony on job traits varies from the DOT classification. *Id.* However, before relying on VE testimony about the requirements of a particular occupation, "the ALJ must [first] ask the VE if his or her testimony is consistent with the DOT." *Wentz v. Comm'r of Soc. Sec. Admin.*, 401 F. App'x 189, 191 (9th Cir. 2010) (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152–53 (9th Cir. 2007)).

If "there is an apparent unresolved conflict between VE . . . evidence and the

DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p.[10] Accordingly, an "ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." *Johnson*, 60 F.3d at 1435. For example, a reasonable explanation for such conflict might include "[i]nformation about a particular job's requirements or about occupations not listed in the DOT . . . from a VE's . . . experience in job placement or career counseling." SSR 00-4p.

Here, the Court does not find a conflict between the VE's testimony and the DOT descriptions for the occupations identified by the VE. First, the ALJ specifically asked the VE what jobs a person could perform with Plaintiff's characteristics and limitations, including a limitation to occasional overhead reaching with the left arm. (Tr. 52). In response, the VE testified that such an individual could work as a cashier, car wash attendant, or fast food worker. (Tr. 52–53). After the ALJ asked the VE whether her testimony was consistent with the DOT, the VE confirmed that it was, with one exception. (Tr. 55).[11] Based on this testimony by the VE, the ALJ found at step five of the evaluation that the VE's testimony was consistent with the information contained in the DOT. (Tr. 26). As a result, the ALJ determined that Plaintiff was not disabled,

---

[10] "An ALJ's failure to inquire into a conflict between the VE's opinion and the DOT job description, and a failure to address and explain such a conflict in the decision, constitutes procedural error." *Hernandez v. Colvin*, No. SACV 15-1431-KS, 2016 WL 1071565, at *4 (C.D. Cal. Mar. 14, 2016). Failure to do so, however, is harmless error where "no conflict existed or if the VE 'provided sufficient support for [his] conclusion so as to justify any potential conflicts'" or deviation from the DOT. *Coleman v. Astrue*, 423 F. App'x 754, 756 (9th Cir. 2011) (quoting *Massachi*, 486 F.3d at 1152–53).

[11] The ALJ added an additional work limitation—a sit/stand, at-will option—to the hypothetical posed to the VE. (Tr. 53). Even with this limitation, the VE testified that a person with Plaintiff's limitations and characteristics could still find work as a parking lot attendant or cashier. (Tr. 53). When the ALJ pointed out that "sit/stand at will is not a factor that's listed in the <u>DOT</u> description of jobs[,]" the VE explained the inconsistency between the DOT and her testimony by stating that she based her opinion on her "30 years of placing people in jobs in the State of Arizona[.]" (Tr. 55). The ALJ then asked the VE whether the remainder of her testimony was consistent with the DOT, and the VE confirmed that it was. (Tr. 55). Notwithstanding, the ALJ ultimately did not incorporate a sit/stand, at-will option into the RFC finding, *see* (Tr. 20), and Plaintiff does not contest the ALJ's finding on this point, *see generally* (Doc. 14).

(Tr. 26), because "there are jobs that exist in significant numbers in the national economy that . . . [Plaintiff] can perform[,]" (Tr. 25).

Next, while Plaintiff argues that "it is at best unclear if any of [the jobs identified by the VE requiring frequent (or even constant) overhead reaching] can be performed using only one arm[,]" (Doc. 14 at 15), the ALJ did not limit Plaintiff to only using one arm for overhead reaching, (Tr. 20). Rather, not only can Plaintiff reach in an unlimited manner in any direction with his right arm, but the ALJ's limitation stated that Plaintiff could "occasionally reach overhead with the nondominant left upper extremity." (Tr. 20). Identical to the limitation of the claimant in *Matthewson*, Plaintiff's ALJ "limitation allows for unlimited reaching with the left arm in any direction except up above shoulder level[,] . . . [a]nd even the limited activity—reaching overhead with the left arm—can be performed occasionally." *Matthewson*, 2015 WL 9297648, at *3.

Although Plaintiff argues that "the jobs offered by the vocational expert ostensibly require frequent (or even constant) *overhead* reaching," (Doc. 14 at 15) (emphasis added), there is nothing in the DOT descriptions indicating that these jobs specifically require overhead reaching at all. *See* Fast Foods Worker, DOT 311.472-010, *available at* 1991 WL 672682; Cashier, DOT 211.462-010, *available at* 1991 WL 671840; Car Wash Attendant, DOT 915.667-010, available at 1991 WL 687869. Rather, "the DOT descriptions of the various positions only indicate that the jobs require unspecified reaching[.]" *Dickmeier v. Comm'r of Soc. Sec. Admin.*, No. 2:14-CV-00967-HZ, 2015 WL 8514188, at *5 (D. Or. Dec. 11, 2015). In contrast, "when an occupation requires overhead work, the *DOT* narrative description will explicitly mention that requirement." *Gonzales*, 2013 WL 3199656, at *3–4; *see also Dickmeier*, 2015 WL 8514188, at *5 (citing examples of DOT job descriptions "expressly indicat[ing] when overhead work is involved"). Here, however, the DOT job descriptions for each of the three occupations cited by the VE do not specifically mention overhead work.

Moreover, the DOT descriptions of the jobs identified by the VE do not indicate that they require the use of *both* arms to frequently reach overhead. *See, e.g.*, *Carey v.*

*Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) (holding that job requirements in the DOT are not "bilateral" and, therefore, do not conflict with VE testimony that an individual with one arm could perform jobs requiring fingering and handling); *Palomares v. Astrue*, 887 F. Supp. 2d 906, 920 (N.D. Cal. 2012) (concluding that occasional overhead reaching limitation for left arm is consistent with the DOT description requiring constant reaching [b]ecause the DOT does not explicitly require constant reaching with both arms"); *McConnell v. Astrue*, No. EDCV-08-667-JC, 2010 WL 1946728, at *6–7 (C.D. Cal. May 10, 2010) (holding that the plaintiff's limitation to work only with one hand did not conflict with jobs requiring reaching and handling because plaintiff was capable of performing these requirements with his other hand and there was no express bilateral requirement in the DOT for those occupations); *Feibusch v. Astrue*, No. CIV-07-00244-BMK, 2008 WL 583554, at *5 (D. Haw. Mar. 4, 2008) (citations omitted) ("[T]he use of two arms is not necessarily required for jobs that require reaching and handling.").

Furthermore, there is no *direct* conflict between the DOT and the VE's testimony. To find a conflict between the VE's testimony and the DOT here, the Court "would have to read a requirement into the DOT that is not there." *Frias*, 2015 WL 8492453, at *7 (citing *Gonzales*, 2013 WL 3199656, at *4). Specifically, "[f]or the Court to find a conflict on these facts, it would have to read into the DOT's description [of the fast food worker, cashier, and car wash attendant] a requirement of *overhead* reaching with *both* arms[, or with the left arm specifically,] on a more than-occasional basis[.]" *Lee v. Astrue*, No. 6:12-CV-00084-SI, 2013 WL 1296071, at *11 (D. Or. Mar. 28, 2013). However, "[a]s the DOT [descriptions of the jobs identified by the VE] do[] not discuss overhead reaching, there is no conflict between the DOT and the ALJ's RFC limitation." *Frias*, 2015 WL 8492453, at *7 (citing *Strain v. Colvin*, No. CV-13-01973-SH, 2014 WL 2472312, at *2 (C.D. Cal. June 2, 2014)). As a result, the ALJ here correctly relied on the testimony of the VE, who had personally experienced over "30 years of placing people in jobs in the State of Arizona," (Tr. 55), and who testified that she relied on the DOT, (Tr. 55). Accordingly, "[t]he VE's testimony is substantial evidence." *Frias*, 2015 WL

8492453, at *7; *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 ("A VE's recognized expertise provides the necessary foundation for his or her testimony."). Thus, because substantial evidence supports the ALJ's decision below, which is free from legal error, the Court here affirms. *See Hammock*, 879 F.2d at 501.

Social Security Ruling 85-15 defines "reaching" as "extending the hands and arms in any direction." SSR 85-15, 1985 WL 56857 (Feb. 26, 1979). However, "courts are divided on the question of whether 'reaching' in the DOT requires the ability to reach in all directions," including overhead, "or whether 'reaching' . . . in the DOT requires the ability to use both arms or hands[.]" *Lee*, 2013 WL 1296071, at *11. Further, "there is no controlling precedent." *Id.* In fact, two cases from within this District, *Matthewson*, 2015 WL 9297648, at *2–6, and *Marquez v. Astrue*, No. CV-11-339-TUC-JGZ-DT, 2012 WL 3011778, at *2–4 (D. Ariz. May 2, 2012), illustrate this dilemma in regard to whether a limitation on overhead reaching with one arm conflicts with a DOT description requiring reaching. Though within the same District, the courts came to markedly different conclusions in these two cases.

In *Marquez*, the claimant argued that according to the descriptions in the DOT, the jobs identified by the VE requiring frequent reaching were incompatible with the claimant's RFC, which limited the claimant from any overhead reaching with his left arm. *Marquez*, 2012 WL 3011778, at *1–2. Accordingly, the claimant alleged that "the VE's testimony was in conflict with the DOT and the ALJ failed to provide sufficient justification for relying on the VE's conflicting testimony." *Id.* at *2. Remanding for further development by the ALJ, the court held that there is an inherent conflict when a VE testifies that a claimant with limited or no use of one arm can perform a job that requires a significant amount of reaching. *Id.* at *3–4. In arriving at this conclusion, the court determined that "frequent reaching includes reaching overhead with both arms" and stated that "[t]he DOT does not distinguish between types of reaching or reaching with the left or right hand." *Id.* at *3. The court also noted that "neither the VE nor the ALJ clarified the potential conflict between Marquez's reaching limitation and the job

requirements." *Id.* As a result, the court concluded that "the VE's testimony regarding Marquez's ability to perform the three identified jobs is not consistent with the DOT's description of these jobs as requiring frequent reaching." *Id.*

Similarly, other courts outside of the District of Arizona have found apparent conflict between restrictions on overhead reaching and DOT descriptions requiring reaching generally in similar circumstances. *See, e.g.*, *Meyer v. Astrue*, No. 1:09-CV-01448-JLT, 2010 WL 3943519, *9 (E.D. Cal. Oct. 1, 2010); *Marshall v. Astrue*, No. 08-CV-1735-L(WMC), 2010 WL 841252, at *6 (S.D. Cal. Mar. 10, 2010). Nonetheless, "*Marquez* is in the minority. Other district courts . . . have generally found that a claimant with limited use of one arm is not precluded from performing a job with frequent reaching, unless the DOT job description explicitly requires bilateral reaching." *Lessley v. Colvin*, No. 15-CV-00096-HDM-VPC, 2015 WL 10710837, at *5 (D. Nev. Nov. 13, 2015) (citations omitted).

Although persuasive, *Marquez* is not binding on the Court. Further, the Court finds that the present case is factually distinguishable from *Marquez*. First, while both the claimant in *Marquez* and Plaintiff here have overhead reaching limitations with their left arms, the extent of these limitations are significantly different. Pointedly, the claimant in *Marquez* was limited from "*any* overhead work with his left upper extremity," *Marquez*, 2012 WL 3011778, at *1 (emphasis added), whereas, here, Plaintiff's RFC states that he can "*occasionally* reach overhead with" his left arm, (Tr. 20) (emphasis added). Further, the court in *Marquez* noted that "neither the VE nor the ALJ clarified the potential conflict between Marquez's reaching limitation and the job requirements." *Marquez*, 2012 WL 3011778, at *3. This is not the case at present, however. Here, the ALJ provided Plaintiff's limitations in a hypothetical to the VE, and explicitly asked the VE if a person with Plaintiff's limitations could perform the identified jobs. (Tr. 51–52).

Rather, the Court finds that the present case is analogous to *Matthewson*. In *Matthewson*, the claimant contended that the jobs identified by the VE requiring frequent overhead reaching were incompatible with the claimant's RFC, which limited him to

occasional overhead reaching with the left arm. 2015 WL 9297648, at *2–3. Accordingly, the claimant argued that "the ALJ erred by relying on the testimony of the vocational expert without resolving [this] purported inconsistency" between the VE's testimony and the DOT. *Id.* at *2. Affirming the ALJ's decision, the court held that a limitation to occasional overhead reaching with the nondominant left arm did not conflict with DOT occupations requiring frequent reaching. *Id.* at *2–6. In coming to this conclusion, the court noted that there was nothing in the DOT job descriptions indicating that the jobs require overhead reaching, nor was there anything in the DOT suggesting that the claimant "must frequently do overhead reaching *and* must use both arms to do it." *Id.* at *3. As a result, the court "determined that the facts of this case do not present an actual conflict between the vocational expert's testimony and the DOT," and, therefore, upheld the ALJ's determination that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" *Id.* at *6. Likewise, here, the ALJ's left-arm restriction is not inconsistent with the frequent (or constant) reaching demands of the occupations identified by the VE, as each occupation's DOT description does not specifically require reaching with both arms or overhead reaching.

Further, other courts have held that a limitation on reaching with one arm does not conflict with a DOT description requiring reaching generally. *See, e.g.*, *Carey*, 230 F.3d at 145–46; *Brown v. Colvin*, No. CV-14-4420-JPR, 2015 WL 3823938, at *7–8 (C.D. Cal. June 19, 2015) (finding that "the ALJ's left-arm restriction was not necessarily inconsistent with the frequent—or constant[—]reaching demands of the jobs identified in [claimant's] step-five finding" where "the tasks listed in each position's DOT description don't necessarily require above-shoulder reaching or reaching with both arms"); *Gonzales*, 2013 WL 3199656, at *4 (finding no apparent conflict between the VE's testimony and the DOT narrative requiring reaching where the plaintiff was limited to only occasional overhead reaching with the right arm); *Palomares*, 887 F. Supp. 2d at 920 (concluding that occasional overhead reaching limitation for one arm was consistent with DOT requirement for constant reaching).

Similarly, other courts have also held that a bilateral restriction on overhead reaching does not conflict with a DOT job description requiring reaching generally. *See, e.g.*, *Dickmeier*, 2015 WL 8514188, at *5 (finding that the DOT descriptions of the jobs identified by the VE requiring frequent reaching are compatible with the plaintiff's occasional bilateral overhead reaching limitation); *Frias*, 2015 WL 8492453, at *7 ("There is no conflict between the ALJ's RFC limitation of 'occasional overhead reaching bilaterally' and the DOT requirement of 'frequent reaching.'"); *Lee*, 2013 WL 1296071, at *10–11; *Hernandez v. Astrue*, No. CV-12–01009-RZ, 2012 WL 4840692, at * 1 (C.D. Cal. Sept. 4, 2012). *But see, e.g.*, *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) (concluding that a bilateral restriction on overhead reaching conflicts with a DOT description requiring reaching generally where claimant could not reach above the shoulder level more than occasionally with either arm)[12]; *Padilla v. Astrue*, No. CV-12–1197-JC, 2012 WL 4356150, at *4–5 (C.D. Cal. Sept. 21, 2012) (concluding that claimant, "an individual who is only limited to occasional 'overhead' reaching", is precluded from jobs requiring "frequent" reaching).

Finally, Defendant correctly notes that, as a result of the failure of Plaintiff's counsel to pursue this issue with the VE at the administrative hearing, Plaintiff has not preserved this issue for appeal. Plaintiff's counsel missed its opportunity to ask the VE about any potential conflict between the RFC limitation to only occasional overhead reaching with the left arm and the DOT requirements of frequent or constant reaching. "[W]hen claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal." *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). The ALJ, rather than the Court, was in the optimal position to resolve any conflict between the testimony provided by the VE about the jobs

---

[12] Although the Ninth Circuit cited *Prochaska* in a footnote in its holding in *Massachi*, 486 F.3d at 1154, this Tenth Circuit case is not binding on this Court on the issue of whether or not a designation in the DOT that an occupation involves frequent 'reaching' is consistent with a claimant's RFC limitation on overhead reaching. *See Matthewson*, 2015 WL 9297648, at *5. Rather, the Ninth Circuit cited *Prochaska* for its holding "that an ALJ's failure to make the relevant inquiries under SSR-004p leaves 'unresolved potential inconsistencies in the evidence.'" *Massachi*, 486 F.3d at 1154.

a person with Plaintiff's limitations could perform and the descriptions of those jobs in the DOT. *See id.* Furthermore, the Court does not find that manifest injustice would occur in deeming the argument waived. *Id.* (noting that a failure to comply with waiver rule is only excused "when necessary to avoid a manifest injustice").

As the VE's testimony was consistent with the DOT, the ALJ did not err in relying on the VE's testimony or by not obtaining an explanation for the alleged inconsistency. Accordingly, the Court holds that the ALJ's determination that Plaintiff is not disabled because "there are jobs that exist in significant numbers in the national economy that the claimant can perform" is supported by substantial evidence. (Tr. 25–26).

**IV.    Conclusion**

For the reasons stated above,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 9th day of August, 2016.

James A. Teilborg
Senior United States District Judge